## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

BEHZAD RAJABI,

      Plaintiff,

  v.

PSA AIRLINES, INC.,

      Defendant.

**CASE NO.** 3:11-cv-00271-WHR

Judge Walter H. Rice

## DEFENDANT PSA AIRLINES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant PSA Airlines, Inc. ("PSA") and files its memorandum in support of its Motion for Summary Judgment.

Date: April 6, 2011

PATRICIA G. GRIFFITH (PG-7741)
Admitted *pro hac vice*
(Lead Trial Counsel)
FORD & HARRISON LLP
271 17th Street NW, Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3800
Facsimile: (404) 888-3863
pgriffith@fordharrison.com

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................4

    A.    PSA and Its Pilots ................................................................4
    B.    Rajabi's Career Prior to PSA ................................................5
    C.    PSA Hires Rajabi ................................................................6
    D.    Rajabi's Early Employment as First Officer ........................7
    E.    PSA's Training Program ......................................................8
    F.    Rajabi's First Upgrade Attempt ........................................10
    G.    Rajabi's Second Upgrade Attempt ....................................17
    H.    Termination of Rajabi's Employment ...............................23
    I.    Rajabi's Additional Complaints of Discrimination/ Unfair Treatment ..............23
    J.    Rajabi's Employment After PSA ......................................25
    K.    PSA's Pilot Workforce ......................................................26

III.  LEGAL ANALYSIS ................................................................26

    A.    Summary Judgment Standard ............................................26
    B.    Rajabi's National Origin Discrimination Claim Fails...........27

        1.    Rajabi Cannot Establish a Prima Facie Case of National Origin Discrimination ................................................27

            a.    Rajabi Was Not Qualified To Be Promoted to Captain ................................................27

            b.    Rajabi Cannot Point to Any Similarly-Situated, Non-Iranian Pilot Who Received More Favorable Treatment ................................................28

        2.    PSA Has Stated Legitimate, Nondiscriminatory Reasons for Not Promoting Rajabi to Captain and for Terminating His Employment ................................................29

        3.    Rajabi Cannot Establish That PSA's Stated Reasons Were A Pretext for Intentional Discrimination................................31

    C.    Rajabi Cannot Establish Any Retaliation Based on Any Protected Activity................................................34

    D.    Rajabi Cannot Establish A Claim of Wrongful Termination Based On Ohio Public Policy ................................................36

IV.   CONCLUSION ................................................................39

## I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

Behzad Rajabi ("Rajabi") is a former PSA pilot whose employment was terminated after he failed two successive attempts to upgrade from a First Officer position to a Captain position. Rajabi first attempted to upgrade in September 2007, but was not recommended by the first check airman for the requisite checkride after he demonstrated deficient performance in simulator training. He was then given remedial training, but was still not recommended for a checkride by a second instructor (acting on behalf of the Federal Aviation Administration ("FAA")). PSA considers a failure to be recommended for a checkride to be a failure to upgrade, and consequently Rajabi was permitted to return to his First Officer position after first requalifying for that position (with difficulty, according to yet another check airman).

After waiting the minimum period of time required by PSA's collective bargaining agreement with the pilots' union, Rajabi again attempted to upgrade. On his second upgrade attempt he was referred for a checkride in April 2008, but his checkride was deemed unsatisfactory by a third check airman (also FAA–designated). He received additional training from still another instructor (who found additional issues with his flying skills) but was given a second opportunity to demonstrate his proficiency in a final checkride with a still different FAA-designated check airman. He again failed.

Over the course of his two upgrade attempts, no less than four check airmen determined, independently, that Rajabi was not capable of safely operating PSA's aircraft as a Captain. Rajabi's union representative witnessed the final checkride and also agreed. Accordingly, Rajabi was not promoted. PSA's collective bargaining agreement with its union provides that after a pilot fails two upgrade attempts, his employment status is at the discretion of the Company. As it has done with every First Officer who failed two upgrade attempts during Rajabi's entire

tenure, PSA severed Rajabi's employment.  Rajabi complained to the FAA, which confirmed that PSA's training decisions had been appropriate.

Rajabi's Complaint herein asserts that PSA discriminated against him on the basis of his national origin (Iranian),  that it subjected him to a retaliation for filing an EEOC charge alleging national origin discrimination, and that it wrongfully terminated his employment in violation of public policy.  Rajabi's claims are brought under both Title VII and the Ohio Civil Rights Act. In the absence of actual evidence of discrimination, Rajabi's claims are in essence his own wild speculation that everyone (PSA check airmen, PSA management, instructors from other companies, the FAA, and even his own union) conspired to fail him out of training so he would be terminated.

Rajabi's claim for discrimination based on his national origin fails because he was not qualified for promotion to Captain and because he cannot point to any similarly situated, non-Iranian, pilots who received more favorable treatment.  Alternatively, PSA has articulated legitimate, non-discriminatory reasons for its decision to terminate Rajabi's employment – namely, its heavy responsibility for ensuring the safety of the traveling public – and Rajabi cannot demonstrate that these reasons are in fact a pretext for discriminatory animus.  Although Rajabi contends that a few comments were made about his national origin, the actual comments are nothing more than a few stray remarks, unrelated to any adverse action and by employees who were not involved in the decision to terminate Rajabi's employment.  Moreover, a few remarks, even if inappropriate, are insufficient to establish discriminatory bias, and PSA's employment statistics belie any discriminatory animus.  Rajabi's retaliation claim fails because he cannot demonstrate that the PSA check airmen who observed him in his 2008 checkrides and decided not to recommend him for upgrade were aware of his Charge of Discrimination, nor that

his failure to pass was related to his EEOC filing. On the contrary, concerns about his flying skills plagued him long before he filed any EEOC charge and at other airlines. Finally, his claim for wrongful discharge in violation of public policy fails because he cannot succeed on the underlying statutory claims and, in any event, the tort of wrongful discharge in violation of public policy is unavailable to a plaintiff where, as here, there is a statutory alternative for seeking relief and an adequate remedy.

The specific Sections of this Memorandum are as follows: Section II, at pages 4-26, sets forth the undisputed material facts that support the Motion for Summary Judgment. Section III, starting at page 26 contains PSA's legal analysis. Section III.A discusses the standard for summary judgment. Section III.B, starting at page 27, discusses the reasons Rajabi's national origin discrimination claim fails. Section III.B.1 discusses Rajabi's inability to establish a *prima facie* claim of national origin discrimination, including that Rajabi was not qualified to be promoted to Captain (Section III.B.1.a at page 27), and that Rajabi cannot point to any similarly-situated, non-Iranian pilot who received more favorable treatment (Section III.B.1.b at page 28). Section III.B.2, starting at page 29, sets forth PSA's legitimate, nondiscriminatory reasons for not promoting Rajabi to Captain (his reported inability to pass the FAA required checkride) and for terminating his employment (his multiple reported failures to upgrade to Captain). Section III.B.3, starting at page 31, establishes that Rajabi cannot show any pretext as the shortcomings in his performance have been conclusively established.

Section III.C, starting at page 34, addresses the reasons why Rajabi's retaliation claim fails, including the lack of knowledge of the relevant decision-makers, the lack of any causal connection between the adverse action and the protected activity, and the sheer lack of any evidence of pretext. Finally, Section III.D, beginning on page 36, discusses the reasons why

Rajabi cannot succeed in establishing a claim for the tort of wrongful discharge in violation of public policy, including that the policy at issue is not jeopardized because of the particular circumstances of Rajabi's case and because Rajabi has alternative remedies available to him through statutes, because Rajabi's discharge was motivated by PSA's concern about his ability to safely operate its aircraft, and because PSA has an overriding business justification for discharging him.

Rajabi's claims are totally lacking in factual and legal support.  Accordingly, PSA's Motion for Summary Judgment should be granted.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")[1]

1.      Rajabi was born in Iran and moved to the United States in 1987.  He became an American citizen in 1993.  (Rajabi Dep. 16-17, 23).

### A.      PSA and Its Pilots

2.      PSA is a regional airline and a wholly owned subsidiary of US Airways Group, Inc.  PSA operates 50 and 70 seat jets as a commercial air carrier subject to the regulations of the FAA.  In order to fly, each jet must be staffed with a Captain and a First Officer.  (Fusi Decl. ¶ 2).

3.      A First Officer's duties include being responsible to the Captain of the flight to which he is assigned.  (Fusi Decl. ¶ 3 and ex. 1).  The First Officer is responsible for performing the duties of Second in Command, which includes performing such things as the preflight visual (walk around) inspection of the aircraft, aiding the Captain in the preflight preparation, operation of the aircraft under the supervision of the Captain, and parking and securing the aircraft.  (*Id.*).

---

[1] PSA does not admit the truth of Rajabi's allegations but takes them as true for purposes of summary judgment only.

4.      The Captain is responsible for performing the duties of the Pilot in Command, which means that as a Captain he is solely responsible for and in command of the aircraft, crew, and passengers. (Fusi Decl. ¶ 4 and ex. 2; Rajabi Dep. 96). A Captain is responsible for the safe and efficient operation of the flight, which includes the exercise of the highest level of judgment and maintaining complete situational awareness as well as ensuring full and complete compliance with all applicable PSA and FAA procedures, directives, and regulations that concern the operation of the aircraft and the flight. (Fusi Decl. ¶ 4 and ex. 2). In short, the Captain is in complete command of the aircraft and crew and he or she must be fully competent and able to fulfill the duties of a Captain to ensure the safe operation of the aircraft. (*Id.*).

5.      PSA pilots are represented by a union, the Air Line Pilots Association, International ("ALPA"), and are covered by a Collective Bargaining Agreement ("CBA") between PSA and ALPA. (Fusi Decl. ¶ 5).

**B.      Rajabi's Career Prior To PSA**

6.      Rajabi began working in the aviation industry as a customer service representative for United Airlines in 1996. (Rajabi Dep. 61 and ex. 1). He worked simultaneously for Era Aviation as a ramp agent. (*Id.*). Also in 1996, Rajabi worked for South Central Aviation as a pilot. (*Id.*).

7.      In 1997, Rajabi went to work for Mazzei Flying Service as a flight instructor. (Rajabi Dep. 58, 61-62 and ex. 1). After working for Mazzei, Rajabi went to work for Cape Air as a pilot. (*Id.* at 66 and ex. 1).

8.      Rajabi left Cape Air to work for Corporate Airlines. (Rajabi Dep. 67 and ex. 1). While at Corporate Airlines, Rajabi attempted to upgrade from First Officer to Captain, but was unsuccessful. (*Id.* at 69 and ex. 2,5). Rajabi does not recall whether he was required to requalify as a First Officer after failing his upgrade attempt at Corporate Airlines. (*Id.* at 71-73).

Corporate Airlines's business records show Rajabi took a First Officer oral examination two days after failing his Captain upgrade attempt. (Rajabi Dep. ex. 2-3). Rajabi admits that a failure requires a requalification. (Rajabi Dep. 74-75).

9.      Rajabi left Corporate Airlines to look for a "more challenging job with more challenging advance aircraft." (Rajabi Dep. 75). He was offered a position with Reliant Airlines, but his ground school class was cancelled after September 11, 2001, and Rajabi never worked or flew for Reliant Airlines. (*Id.* at 76). Nonetheless, Rajabi represented on his resume that his "work experience" included working at Reliant Airlines from August until sometime after September 11, 2001. (*Id.* at 76-78 and ex. 1). Rajabi's resume states that he was a First Officer on the DC-9 aircraft, but in fact he never flew a DC-9. (*Id.* at 78 and ex. 1). Rajabi also listed Reliant Airlines as "work experience" on his application for employment with PSA, despite having never flown for that airline. (Rajabi Dep. 81-82 and ex. 4). Rajabi never told anyone at PSA that these representations on his resume and application were not true, because no one asked him. (Rajabi Dep. 78).

10.     Rajabi was self-employed as a flight instructor from September 2001 until he went to work for PSA. (Rajabi Dep. 79).

**C.      PSA Hires Rajabi**

11.     PSA hired Rajabi as a First Officer on or about April 19, 2004. (Rajabi Dep. 114-15). At that time, Rajabi had admittedly failed a type ride with the FAA and an upgrade attempt at a prior airline. (Rajabi Dep. 69, 86 and ex. 5). In explaining his failed upgrade attempt, Rajabi wrote "but I had no problem at sim[ulator]" even though he never made it to the simulator portion of that upgrade attempt. (Rajabi Dep. 82-85 and ex. 5).

12.     At the time of his hiring, PSA provided Rajabi with its employee handbook and its Non-Discrimination and Non-Harassment Policy. (Rajabi Dep. 104-05, 109 and ex. 6-9).

This policy prohibits discrimination on a number of categories, including national origin, and expressly protects any employee who makes a complaint of this nature from retaliation.  (Rajabi Dep. ex. 9).  Rajabi understood that PSA's policy prohibits discrimination and harassment and provides a complaint procedure for employees who believe they have been the victim of discrimination or retaliation.  (Rajabi Dep. 110-11 and ex. 8-9).   The policy provides such that complaints are to be made to either Human Resources or the Company's President.   (Rajabi Dep. ex. 9).  Although Rajabi was aware of the complaint procedure, he never made any complaints of discrimination or retaliation to either the Company President or to Human Resources while employed with PSA.  (Rajabi Dep. 112).

13.     Upon hire, PSA provided Rajabi with approximately one or two months of flight training.  (Rajabi Dep. 115-16).

14.     Following this training and prior to being allowed to fly revenue passengers (known as "line" flying), Rajabi was required to pass an initial checkride on or about June 4, 2004.  (Rajabi Dep. 119-20 and ex. 10).  On three tested maneuvers, Rajabi's initial performance was unsatisfactory and he required a second attempt to pass the maneuver.  (*Id.* at 123 and ex. 10).  Although Rajabi ultimately passed this checkride, the examiner noted that Rajabi's "situational awareness" needed improvement.  (Rajabi Dep. ex. 10).  Situational awareness is something every pilot needs.  (Rajabi Dep. 120).  This initial examiner, however, was not a PSA pilot, and it is undisputed that a PSA examiner would not normally pass a new hire pilot with more than two unsatisfactory maneuvers in an initial proficiency checkride.  (Christner Dep. 89).

D.     **Rajabi's Early Employment as First Officer**

15.     In 2004, as part of the hiring process, Rajabi presented a passport to PSA. Rajabi's passport was expired.  (Rajabi Dep. 144).  Rajabi testified that Dave Eldridge, a PSA employee, told him that PSA needed to see a current passport because his passport was expired

and he was Iranian.  (*Id.*)  Once Rajabi presented PSA with a current passport, he was allowed to continue with his training.  (*Id.*)  Rajabi felt that Eldridge had discriminated against him because of the way in which he requested that Rajabi provide PSA with a current passport.  (Rajabi Dep. 144-45).  Rajabi admits that an airline has a legitimate business reason for needing current passports for its pilots.  (Rajabi Dep. 145).

16.      In January, 2005, while a First Officer still in his probationary period, Rajabi failed a proficiency check.  (Rajabi Dep. 124).  Although he was in his probationary period, PSA did not terminate Rajabi's employment at that time.  (Rajabi Dep. 125).  Rajabi's check airman had been a contract check airman, and then-Manager of Flight Standards Randal Fusi did not want a pilot's career to be determined by a contract check airman; he wanted a PSA check airman to evaluate Rajabi.  (Fusi Dep. 22).  Accordingly, Rajabi was given additional simulator training.  (Rajabi Dep. 125*)*.

17.      After his additional simulator training, Rajabi underwent a line check, which was administered on February 17, 2005 by Captain Jason Kyle, a check airman for PSA.  (Rajabi Dep. 127 and ex. 11).  Although Rajabi passed the line check, Captain Kyle recommended that Rajabi fly with a check airman for a period of time to reinforce Company policies and procedures.  (Rajabi Dep. ex. 11).  Rajabi was unable to think of any reason other than competency that a Company would require a First Officer to fly with a check airman to reinforce policies and procedures.  (Rajabi Dep. 131).

### E.      PSA's Training Program

18.      PSA owes a duty to the traveling public and its crews to operate the airline in the safest manner possible.  (Fusi Decl. ¶ 6; Rajabi Dep. 89).  As part of that duty PSA must constantly assess its pilots to determine if they meet the qualifications to safely operate the aircraft they fly.  (Rajabi Dep. 99; Fusi Decl. ¶ 6).  If there is any doubt about a pilot's

qualifications, judgment, or integrity, PSA has no choice but to remove that pilot immediately from service – it is required by law. (Fusi Decl. ¶ 6). PSA cannot take the approach of "let's see how the pilot does and hopefully things will be fine." All it takes is one mistake when making split second decisions that can have devastating consequences, costing lives. (*Id.*). Rajabi himself admits that an airline cannot allow a pilot to fly its aircraft if it believes that pilot to be unsafe. (Rajabi Dep. 90-91). Accordingly, PSA operates and administers a training and evaluation program that has been approved by the FAA. (Fusi Decl. ¶ 6; see also Rajabi Dep. 88). Indeed, the FAA oversees PSA's training program. (Fusi Decl. ¶ 6). The PSA training program meets or exceeds the requirements set by the FAA for establishing and maintaining a training program for its pilots. (*Id.*). Upgrade training, which is **optional,** includes training and evaluating First Officers who desire to move into the Captain position. (*Id.* at ¶ 7; Rajabi Dep. 98-99). Among other things, upgrade training includes ground training and a simulator "check" ride. (Fusi Decl. ¶ 7). Pilots are given a series of evaluations at various points in the upgrade training program to assess the pilot's capabilities of assuming the greater responsibilities of Captain. (*Id.* at ¶ 8). Every pilot who attempts to upgrade to the Captain position must successfully complete each part of the training in order to become a qualified Captain. (*Id.*).

19.    The training department at PSA, overseen by then-Manager of Flight Standards Randal Fusi, is a separate department from Flight Operations, which handles the flight operations aspect of the airline for PSA's pilots, including pilot employment and discipline. (Fusi Decl. ¶ 25). The check airmen are part of the training department and they train pilots and administer FAA–mandated checkrides. (*Id.*) PSA's training department has several Aircrew Program Designees ("APD"). (*Id.*) An APD is a pilot who is authorized to, and does, act on behalf of the FAA in performing checkrides. (Christner Dep. 10-11; see also Fusi Decl. ¶ 16). Aircrew

Program Designee is the highest rating that an instructor can achieve in the training department of a commercial air carrier. (Rajabi Dep. 177). The training department has no authorization over the employment status of pilots. (Fusi Decl. ¶ 24; *see also* Fusi Dep. 103-05 and Rajabi 224-26).

20.     The pilots' Collective Bargaining Agreement ("CBA") contains provisions about how a First Officer may become a Captain (through a bid system to enter training) and what happens if a pilot fails to successfully complete upgrade training. (Fusi Decl. at ¶¶ 9, 10). Specifically, the CBA states that if a pilot fails in his first attempt to upgrade, the pilot will return to his former First Officer position if it is available and the pilot is qualified to return to that position. (Fusi Decl. ¶ 9). The CBA further states that if a pilot fails his first attempt to upgrade, he must wait at least six months before he can bid for another open Captain position. (*Id.* at ¶ 10). Finally, the CBA states that if a pilot fails in his second attempt to upgrade to a Captain position, that pilot may be dealt with at the Company's discretion, which means that PSA can and historically has terminated the pilot's employment. (*Id.* at ¶ 10).

21.     During Rajabi's entire tenure, PSA has terminated the employment of every pilot who has failed to qualify as a Captain on his second upgrade attempt, or allowed the pilot to resign his employment in lieu of termination. (Fusi Decl. ¶ 12; Fusi Dep. 110).[2]

**F.     Rajabi's First Upgrade Attempt**

22.     In September 2007, Rajabi first requested to upgrade to a Captain position. (Rajabi Dep. 134). Rajabi attempted to upgrade at the earliest opportunity he had pursuant to the seniority list. (*Id.* at 135). PSA placed Rajabi in an upgrade class immediately. (*Id.* at 140). Rajabi received the same classroom training as all of the other First Officers in his class. (Fusi

---

[2] Fusi testified he had heard of one exception years before Fusi was employed (2004), but he had no personal knowledge of that situation. (Fusi Dep. 110).

Decl. ¶ 13). Rajabi admits that he does not know the national origins of the other pilots in his upgrade class. (Rajabi Dep. 140).

      23.     Rajabi successfully completed the initial portions of upgrade training and moved on to the simulator portion of the training and evaluation. (Fusi Decl. ¶ 13). Rajabi did not believe that he had been discriminated against at this point in his upgrade attempt. (Rajabi Dep. 142). While in the simulator the pilot is given a series of tasks and maneuvers he must successfully complete to receive his FAA type rating to become a Captain – a pilot is required to have a type rating to become a Captain. (Fusi Decl. ¶ 14). The events which take place in the simulator include normal preflight duties, as well as actual in-flight situations which include both normal and abnormal/emergency events. (*Id.*). The purpose of the simulator event is to replicate actual flying in a safe environment so the pilot can be evaluated to determine if he meets the qualifications for the Captain position. (*Id.*).

      24.     In September 2007 Rajabi was given four simulator training sessions with Captain Kyle (on September 10, 11, 12, and 13). (Rajabi Dep. 146-47 and ex. 14). At that time, Company policy allowed for pilots attempting to upgrade to receive four simulator training sessions. (Fusi Decl. ¶ 15). Rajabi was paired with a fellow trainee, Samantha Walker. (Rajabi Dep. 146). At his arbitration, Rajabi testified under oath that he was happy with the training he received from Captain Kyle (*Id.* at 156), but at his deposition he claimed that Captain Kyle showed "favoritism" toward Walker. (*Id.* at 157). Rajabi complains that Kyle approved Walker to take a checkride even though, in his opinion, she did not perform well in training. (*Id.* at 160-61).

      25.     Captain Kyle's notes indicate Rajabi's "situational awareness and CRM [crew resource management] need[ed] work," that Rajabi was "confused" on standard call procedures,

that he made "many mistakes" such as "forcing" events, and that he had a "habit of flying outside [the] command bars." (Rajabi Dep. ex. 16). At the end of Rajabi's four training sessions, Captain Kyle indicated that he could not recommend Rajabi to continue in the upgrade process because Rajabi needed another training session. (Rajabi Dep. 165). Rajabi disagreed with Captain Kyle's assessment. (*Id.*). Rajabi admits, however, that a Captain is required to demonstrate a mastery of complex judgment, situational awareness, and leadership. (*Id.* at 96).

26.    Rajabi asserts that at some point during his debriefings, Captain Kyle made a comment about Rajabi's accent, asking him if he ever thought he would find a job at a place where they could understand him. (Rajabi Dep. 166). He also claims that Captain Kyle occasionally asked him where he was from, how he got here, and how he became a citizen. (*Id.* at 168). Rajabi never called Human Resources or the President of the Company (as specified by the policy he received) to complain about Captain Kyle's comments. (*Id.* at 168-69).

27.    Rajabi reported for his remedial simulator session in the same location and on the same equipment on September 14, 2007. (Rajabi Dep. 165-66 and ex. 15). Captain Gilliam, a PSA check airman and an APD, was assigned as the instructor. (*Id.* at 166, 176-77).

28.    Rajabi believed that he performed satisfactorily during the remedial training session. (Rajabi Dep. 183-84). However, the simulator training log indicates that Rajabi over-rotated past the command bars during the training session. (Rajabi Dep. ex. 16). Rajabi admits that over-rotating past the command bars, during a real flight, could cause a crash. (Rajabi Dep. 183). On several training items, Rajabi was initially marked "T," indicating that further training is required, before progressing to a rating of "P" which indicates proficiency on the item. (*Id.* at 187-88). However, on other items, Rajabi was rated "T" throughout. (*Id.* at 188 and ex. 16). Rajabi admits that he must be rated "P" to be recommended for a checkride. (*Id.* at 187).

Notably, Rajabi rated "T" in judgment and CRM in all five sessions, and a "T" in situational awareness in four of the five sessions, including the final one. (Rajabi Dep. ex 16).

29.    At the end of the remedial training session, Captain Gilliam did not recommend Rajabi for a checkride. (Rajabi Dep. 177; Glenn Decl. ¶ 3). A failure to be recommended for a checkride is treated as a checkride failure for upgrade purposes at PSA. (*Id.* at 177; Glenn Decl. ¶ 3). At the end of his training session on September 14, 2007, Rajabi was aware that his attempt to upgrade to Captain was unsuccessful. (Rajabi Dep. 177). Rajabi admits that he is unaware of anyone who was not recommended for a checkride after receiving remedial simulator training, and yet was not considered as having failed to upgrade. (*Id.* at 178). Rajabi also admits that if Captain Gilliam did not believe that he was demonstrating the skills and judgment needed for an upgrade, that he would be wrong to pass Rajabi. (*Id.* at 206). Indeed, Rajabi admits that an airline is obligated to ensure that a pilot not fly if the pilot is not proficient in his skills, and that an airline should err on the side of caution concerning safety. (*Id.* at 91-92).

30.    Rajabi believes that Captain Gilliam set him up to fail in his remedial simulator training. (Rajabi Dep. 173). He believes that Captain Gilliam discriminated against him based on his national origin because at a casual encounter at a hotel Captain Gilliam commented on Rajabi's accent and asked where he was from. (*Id.* at 178-79). When Rajabi told Captain Gilliam that he was from Iran, Captain Gilliam asked him if he was in Iran during the hostage crisis. (*Id.* at 179, 182). Captain Gilliam also asked Rajabi how he got to the United States. (*Id.* at 179). Rajabi claims that Walker told him that Captain Gilliam also asked her personal questions about whether her husband worked on a boat or boat races. (*Id.* at 180-81). Rajabi believes that any personal question by an instructor is improper, and that he and Walker were both "scared." (*Id.* at 181).

31.     At the end of the remedial training session, Captain Gilliam stated that Rajabi was not "good" enough for either the right or left seat and should pack his bags and leave.[3] (Rajabi Dep. at 175). It is undisputed, however, that a check airman has no authority to discipline (or suspend) a pilot. (Fusi Dep. 30; Fusi Decl. ¶ 25; *see also* Rajabi Dep. 224-25). Rajabi then left training, claiming that he left because the check airman sent him home. (Rajabi Dep. 220).

32.     After his failure to be recommended by Captain Gilliam, Rajabi called ALPA, and shortly thereafter he received a call from Fusi. (Rajabi Dep. 214-15).

33.     During these phone calls, Fusi informed Rajabi that he needed to take a checkride and requalify for a First Officer position. (Rajabi Dep. 221-22). Rajabi told Fusi that he could not come in because he was sick and instructed Fusi to stop calling. (*Id.* at 223-24). Rajabi also informed the Chief Pilot, Captain William Barnett, who Rajabi reported to, that he was sick. (*Id.* at 226).

34.     At deposition, Rajabi claimed he could not recall what his medical problem was. (Rajabi Dep. 222). In fact, on September 18, 2007, Rajabi visited his doctor and admitted that he could not perform in the flight simulator training because of "claustrophobia" and it "may cost my job." (Glenn Decl. ¶ 5 and ex. 3).[4]

35.     Effective September 20, 2007, PSA placed Rajabi on a personal leave of absence after he left his upgrade training for "possible medical reasons." (Rajabi Dep. ex. 19).

36.     PSA changed Rajabi's status to a paid medical leave of absence upon receipt of a doctor's note for this absence. (Rajabi Dep. 228-29, 234; see also Glenn Decl. ¶ 4). The doctor's note cited only "medical problem" as the reasons for his absence from September 18

---

[3] This simulator training took place in Montreal. (Rajabi Dep. 178).
[4] Rajabi denied any doctor's visit in his subsequent applications for medical certification to the FAA. (Glenn Decl. ¶ 5 and ex. 4).

through September 24.  (Rajabi Dep. ex. 20).  PSA placed Rajabi on unpaid leave effective September 25, 2007, until he could return to work. (Glenn Decl. ¶ 4).

37.    When Rajabi decided he was ready to return to work, he called Captain Barnett to tell him he was ready to come back, and subsequently noticed that his on-line schedule showed him as "suspended." (Rajabi Dep. 228).  A pilot's schedule is entered as suspended when he is out on unpaid status.  (Glenn Decl. ¶ 4).

38.    Rajabi asserts that sometime in September of 2007, he spoke to Captain Kyle, complained about Walker's performance during training, and stated he thought he was being discriminated against because he was Iranian (Rajabi Dep. 314-15).  Kyle allegedly told him to be quiet or Kyle would "come to the arbitration and you are going to lose.".  (*Id.* at 315-16).  It is undisputed, however, that Rajabi had not filed any grievance at that time.  (*Id.* at 315-16).  Nor did he ever file a grievance over his first upgrade attempt.  (See SUMF 42, *infra*).

39.    Upon learning from Rajabi that he was ready to return, PSA's training department called Rajabi and directed him to report for his recheck in Montreal, Canada.  (Rajabi Dep. 235).

40.    Prior to taking his requalification check as a First Officer, Rajabi received more training in the simulator.  (Rajabi Dep. 241-42).  Rajabi was trained by Captain Jeremy Swicegood on October 22, 2007.  (Rajabi Dep. ex. 22).  Swicegood  recommended Rajabi for a checkride.  (*Id.*).  On October 23, 2007, Rajabi underwent a proficiency check on the same aircraft and in the same location as he had been trained the previous day.  (Rajabi Dep. 249 and ex. 23).  This time, Captain Dale Arnold evaluated him.  (Rajabi Dep. 249-50).  During his proficiency check, Rajabi performed one unsatisfactory maneuver, but Captain Arnold retrained him to proficiency and passed him to return to First Officer status.  (Rajabi Dep. 250 and ex. 23).

41.     After the proficiency check, Rajabi complained to Chief Pilot Barnett and the union that Swicegood, who was co-pilot for him during the recheck, was not doing his job and that Captain Arnold did not exercise his authority to "stop [Swicegood] for his nonsense." (Rajabi Dep. 251, 255).  Rajabi believed Swicegood (who had just recommended him) set Rajabi up to fail this requalification checkride.  (*Id.* a 250-51).  Rajabi cannot testify that the actions of either Captains Swicegood or Arnold were based on his national origin.  (*Id.* at 252, 256-57).

42.     In December 2007, Rajabi filed a grievance with the union regarding his lost pay while out of work, but he was unsuccessful.  (Rajabi Dep. 258-59; Glenn Decl. ¶ 6).  Rajabi appealed but lost his appeal, and the pay grievance never went to arbitration.  (Rajabi Dep. 260). Rajabi did **not** grieve his first failure to upgrade or his complaints about his requalification check because he was told by ALPA that he did not have facts to support such a grievance.  (*Id.* at 258-59; see also Glenn Decl. ¶ 6).

43.     In March, 2008, Rajabi filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that PSA discriminated against him based on his national origin.  (Rajabi Dep. ex. 24).  In the Charge, Rajabi referred to the remedial simulator training session on October 16, 2007, but did not state that he was asked about his accent or about the Iran hostage crisis.  (Rajabi Dep. 264).  He claimed that only Americans or people without accents were promoted to Captain, and testified that he was referring to Walker, who was upgraded despite having "an issue."  (*Id.* at 265).  Rajabi also testified that he was referring to three other individuals, but he could not remember their names. (*Id.* at 266).  The EEOC investigated Rajabi's Charge and concluded that there was no basis to believe a violation of the law had occurred.  (Rajabi Dep. 268 and ex. 26).

G.      **Rajabi's Second Upgrade Attempt**

44.      Between Rajabi's first and second upgrade attempts, the Company changed its upgrade training policy from providing four simulator sessions to providing six simulator sessions. (Fusi Decl. ¶ 22; Rajabi Dep. 151). The reason for the Company's decision to change its policy was that many of its pilots were attempting to upgrade with significantly less flying experience than in the past. (Fusi Decl. ¶ 22).

45.      Pursuant to the CBA, Rajabi was required to wait a minimum of six months before attempting to upgrade again. (Fusi Decl. ¶ 19; Rajabi Dep. 269). Rajabi applied to upgrade as soon as he became eligible again. (Rajabi Dep. 270; Fusi Decl. ¶ 21). Rajabi was officially eligible for upgrade as of March 15, and started his upgrade training on March 19, 2008, merely days after becoming eligible again. (*Id.* at 272-73; *see also* Fusi Decl. ¶ 21). Rajabi testified that he waited the minimum period of time to attempt to upgrade again because in his opinion "I was talking in the first place to go to the type rate. There is no check difference between checkride on the right seat and checkride on the left seat. If I am competent to fly the same aircraft on the right seat, I am competent to do it on the left seat as well. There is no difference." (*Id.* at 274-75). The right seat is the First Officer position, with the left seat being the Captain position. (*Id.* at 222; *see also* Fusi Decl. ex. 1, 2).

46.      Rajabi received the benefit of the changed policy for his second upgrade attempt, and received all six simulator training sessions. (Rajabi Dep. 291). Rajabi is unaware of anyone in his training class, or in general in April, 2008, who received more than six simulator sessions before being given a checkride. (*Id.* at 301).

47.      Rajabi admits that he was aware that if he failed his second attempt at upgrading to Captain, his employment could be terminated. (Rajabi Dep. 275). Rajabi also admits that he

is not aware of any pilots who failed two attempts at upgrading and yet remain employed by PSA. (*Id.* at 277).

48.     Rajabi attended ground school training in connection with his upgrade attempt from March 19 – 25, 2008. (Rajabi Dep. 279). There were nine or twelve people in Rajabi's upgrade class, and Rajabi does not know their national origins. (*Id.* at 284). Rajabi passed ground school and took an oral exam. (*Id.* at 280). He claims that his oral exam was improper because he had trained on the CRJ-700 aircraft, but on the morning of the exam he was told that the exam would cover the CRJ-200 aircraft instead. (*Id.* at 281). Rajabi had previously been trained on the CRJ-200 aircraft in connection with his prior upgrade attempt, and his training documents for his March, 2008 training indicate that he received training on both the CRJ-200 and CRJ-700 aircraft. (*Id.* at 282). Rajabi studied and prepared to upgrade on both aircraft during the six months between his upgrade attempts. (*Id.* at 284-85). Rajabi told his examiner, who was a representative of the FAA, that the Company was violating the Federal Aviation Regulations ("FARs") by giving him an exam on equipment he had not been trained on. (*Id.* at 285). The examiner asked if Rajabi was comfortable taking the examination, and Rajabi stated that he was. (*Id.* at 285). He passed his oral examination. (*Id.* at 285).

49.     Rajabi also felt that his ground school training was unfair because he chose a training partner, but PSA pulled that individual out and gave him a new partner. (Rajabi Dep. 286-87).

50.     Rajabi's six simulator sessions were conducted by a Flight Safety instructor, Greg Vallero, who was not a PSA employee. (Fusi Dep. 75; Rajabi Dep. 290). Rajabi complains that he did not receive a syllabus for three of his six sessions, but admits that no one in his class received the syllabus during that time. (Rajabi Dep. 294). Rajabi admits that the

-18-

information contained in the syllabus would not change from his first upgrade attempt to his second.  (*Id.* at 296).  Rajabi admits that nothing else improper occurred during his simulator training.  (*Id.* at 298).  At the conclusion of the simulator sessions, Vallero gave Rajabi a mock checkride.  (*Id.* at 299).  Rajabi admits that nothing improper occurred during his mock checkride.  (*Id.*).  Vallero concluded that Rajabi had met the required levels for the curriculum and recommended a checkride.  (*Id.* at 298-99).

51.     Rajabi alleges that right before his actual checkride, Vallero remarked that he had heard that Rajabi was trying to sue the Company.  (Rajabi Dep. 292-93).  Aside from this hearsay remark, Rajabi admits that nothing else discriminatory or retaliatory happened to him during this initial simulator training.  (*Id.* at 293).

52.     Rajabi's check ride took place on April 6, 2008, the day after he completed his simulator training.  (Rajabi Dep. 300).  He performed the checkride on the same equipment, and in the same location, as he had been trained.  (*Id.* at 300-01).  APD Captain Christner administered the checkride, and Darren Harris, the check airman supervisor, was also present.  (*Id.* at  300, 304).  Rajabi believes that Captain Harris's presence at his checkride was evidence of discrimination based on his national origin.  (*Id.* at 305-07).  Rajabi bases this belief on his unawareness of any reason for Captain Harris's presence.  (*Id.* at 306-07).  It is undisputed, however, that it was not uncommon for an extra instructor to sit in on a checkride, and Christner was a relatively new ADP.  (Christner Dep. 37-8, 82; see also *id.* at 12-13).  Rajabi also claims that during the briefing he was told to speak more slowly because of his accent, but admits that he sometimes speaks quickly and that there is nothing inherently wrong with asking an individual to speak slowly.  (Rajabi Dep. 305, 317-18).  He feels the request was discriminatory

because in the previous session he had "no issue, and all of a sudden that becomes an issue." (*Id.* at 318).

52.     Rajabi complains that Captain Harris received a telephone call during his checkride, and that this was discriminatory because it was a distraction to him. (Rajabi Dep. 318-19). Rajabi also complained that someone pretended to be a flight attendant and offered him a cup of coffee. (*Id.* at 321-22). However, the FAA's Practical Test Standards require that the examiner cause a realistic distraction during a practical test. (Rajabi Dep. ex. 30; *see also* Christner Dep. 87-8, 91-2).

53.     Rajabi admits that he does not know whether either Captain Christner or Captain Harris was aware of his pending EEOC Charge. (Rajabi Dep. 323, 336).

54.     Rajabi's checkride lasted 2.8 hours. (Rajabi Dep. ex. 31). It is undisputed that Captain Christner's average checkride lasted 2.5-2.7 hours. (Christner Dep. 18). Rajabi admits that FAA Publication 8900, which address airman certification, notes that one explanation for a flight test lasting more than 2.5 hours is the poor performance of the applicant, although he personally does not agree. (Rajabi Dep. 329). Rajabi admits that performing a descent maneuver would increase the amount of time required to complete a checkride, and that the FAA had recently begun requiring PSA to do descent maneuvers on its checkrides. (*Id.* at 330).

55.     Captain Christner found Rajabi unsatisfactory on five items during the April 6, 2008 checkride. (Rajabi Dep. ex. 31; Christner Dep. 30-33). Rajabi asserts that Captain Christner only found him unsatisfactory on two items but that the Company insisted that three more be added. (Rajabi Dep. 335; *but see* Christner Dep. 34). Rajabi admits, however, that only one unsatisfactory item would be sufficient to fail him on the checkride. (*Id.* at 338). Captain Christner specifically found Rajabi's performance deficient on both single engine and two-

engine missed approaches, ILS approach, emergency descent, and stability during a flapless

landing. (Rajabi Dep. 326 and ex. 31). Rajabi disagrees with Captain Christner's assessment on

each item. (Rajabi Dep. 326). Rajabi asserts that he performed each item satisfactorily and that

Captain Christner was wrong for failing him. (*Id.* at 331, 335).

      56.     Captain Christner and Captain Harris did not say anything to Rajabi concerning

his national origin. (Rajabi Dep. 336). After the checkride, Captain Christner gave Rajabi his

personal cell phone number and offered to help him or answer any questions he had as he

prepared for the second checkride in his second upgrade attempt. (*Id.* at 337). Rajabi believed

that Captain Christner was sincere in his offer to help. (*Id.* at 337).

      57.     On April 9, 2008, Rajabi received additional, remedial simulator training from

D.W. Bryant, an instructor from Flight Safety. (Rajabi Dep. ex. 32; Rajabi Dep. 341). The

simulator training session took place on the same equipment and in the same location as Rajabi's

checkride with Captain Christner. (Rajabi Dep. 342). Captain Bryant found Rajabi

unsatisfactory on several items that Captain Christner had not identified, and had to train Rajabi

to proficiency on those items as well, before passing him on for another checkride. (Rajabi Dep.

ex. 32). Rajabi admits that Captain Bryant did not make any statements indicating that he had a

discriminatory or retaliatory bias against Rajabi. (Rajabi Dep. 342-43).

      58.     On April 10, 2008, Rajabi had a final checkride, administered by a different PSA

check airman, Bruce Kumke, who was also a APD. (Rajabi Dep. ex. 33). The checkride took

place the day after Rajabi received his remedial simulator training from Captain Bryant, in the

same location and on the same aircraft. (Rajabi Dep. 354). Vallero acted as the First Officer,

which Rajabi believed was improper because Vallero was an employee of Flight Safety, not

PSA. (*Id.* at 358-59, 362). Rajabi asserts that Vallero impacted his performance by the way

Vallero handled the checklist and procedures. (*Id.* at 361). Fusi attended the checkride, as did Captain Chase, a representative from ALPA. (*Id.* at 354-55). Captain Chase attended because Rajabi had requested an ALPA representative be present. (*Id.* at 355). However, Rajabi said that ALPA's presence at his checkride made him feel less comfortable because "they [are] all in the same bed." (*Id.* at 365). Captain Chase agreed that Rajabi failed the checkride and told Fusi that he would not have let the checkride go on as long as Captain Kumke had. (Fusi Dep. 113-14). Rajabi did not have any problem with Captain Chase until after the checkride, because Captain Chase failed to object to Vallero's presence and agreed with the outcome. (Rajabi Dep. 368).

59. Rajabi found Captain Kumke's behavior in the simulator to be "obnoxious" but admits that Captain Kumke did not make any remarks about his national origin or refer to it in any way. (Rajabi Dep. 369). Rajabi did not know whether Captain Kumke's behavior related to his national origin, or whether Captain Kumke was aware that Rajabi had filed an EEOC Charge. (*Id.* at 370). At the conclusion of the checkride, Captain Kumke determined that Rajabi's performance had been unsatisfactory on **13** of 21 checked items, including without limitation normal landings, crosswind landings, normal and abnormal procedures, emergency procedures, missed approaches, visual approaches, judgment, and crew coordination. (Rajabi Dep. ex. 33).

60. Rajabi was allowed to complete the entire checkride despite his unsatisfactory performance. (Rajabi Dep. 370-72). Prior to the checkride, Rajabi had been given, and chosen, that option. (*Id.* at 371). However, he now claims that it was improper to allow him to complete the checkride because the checkride was unfair. (*Id.* at 373).

61. Rajabi does not believe that he performed unsatisfactorily on **any** item during his April 10, 2008 checkride. (Rajabi Dep. 378).

62. During the checkride, none of the attendees said anything about Rajabi's national origin. (Rajabi Dep. 383). Nor did any of the attendees say anything about Rajabi's EEOC Charge. (*Id.* at 383).

63. Rajabi did not contact anyone in management at PSA after failing his second upgrade attempt to inform them that he believed his failure was related to discrimination based on his national origin or retaliation. (Rajabi Dep. 386-87).

**H.** **Termination of Rajabi's Employment**

64. After failing his second attempt to upgrade, Rajabi received a telephone call and then a letter from the Chief Pilot's office informing him that his employment with PSA was terminated. (Rajabi Dep. 383 and ex. 36).

65. Rajabi's employment was terminated effective April 14, 2008. (Rajabi Dep. ex. 36). Rajabi's termination was consistent with the CBA and PSA's practice. (Fusi Decl. ¶¶ 12, 24). During Rajabi's entire tenure, every pilot who has failed two upgrade attempts has been separated from employment with PSA. (*Id.*). Many of those pilots are of American origin. (Glenn Decl. ¶ 9; Christner Dep. 82).

66. PSA's practice has been to terminate, or allow the resignation of, pilots who fail to upgrade to Captain on their second attempt. (Fusi Decl. ¶¶ 12, 24).

67. Rajabi admits that he cannot identify a single individual who failed two upgrade attempts and remained employed. (Rajabi Dep. 277).

**I.** **Rajabi's Additional Complaints of Discrimination/ Unfair Treatment**

68. On June 1, 2008, Rajabi filed a second charge of discrimination alleging national origin discrimination based on his second upgrade attempt and retaliation. (Rajabi Dep. ex. 38).

69.     The EEOC issued a "no cause" determination for this discrimination charge as well, concluding that it was "unable to conclude that the information obtained establishes violations of the statutes." (Rajabi Dep. 393 and ex. 39).

70.     Rajabi filed one complaint with the FAA, and one complaint with the FAA Office of Civil Rights, and the agency rejected both claims. (Rajabi Dep. exs. 40-41).

71.     Rajabi filed a complaint with the FAA Hotline, which the agency investigated by, *inter alia*, interviewing witnesses. (Rajabi Dep. 395). At the conclusion of its investigation, the FAA issued a letter to Rajabi stating that it rejected his claims of unfair treatment in his checkride, and that there "were no deviations from [PSA's] approved training program [and] all Federal Aviation Regulations were also complied with during your training and checkride." (Rajabi Dep. 395 and ex. 42). Rajabi admits that he understood that the FAA had taken the position that he had legitimately failed his checkride. (Rajabi Dep. 398).

72.     Rajabi pursued every other possible avenue to challenge the employment decisions at issue in this case, but failed at every turn. No agency has found that Rajabi was mistreated in his upgrade attempts or that he should have passed. (Rajabi Dep. 399-400).

73.     Rajabi filed a grievance with ALPA concerning his second upgrade failure and his termination. (Rajabi Dep. 388). Rajabi was represented by counsel and witnesses were called and cross examined by both sides. In upholding PSA's decision to terminate Rajabi's employment after his second upgrade failure, the arbitrator held that PSA "made an honest determination that [Rajabi] was not competent to operate its aircraft safely" and that "there was no evidence that the Company acted in [a] . . . discriminatory manner." (Rajabi Dep. 388, 391 and ex. 37).

74. Rajabi also filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that the Company treated him unfairly during the upgrade training process and that ALPA had ineffectively represented him. (Rajabi dep. ex. 43). OSHA rejected his complaint. (Rajabi Dep. 399).

**J.** **Rajabi's Employment After PSA**

75. After his termination from PSA, Rajabi searched for employment with both cargo and passenger airlines. (Rajabi Dep. 26-27). He ultimately accepted employment with SkyLease, a cargo airline, in Miami, Florida. (*Id.* at 31).

76. Rajabi left SkyLease in 2011. (Rajabi Dep. 30). After first refusing to answer, he testified at deposition that he left SkyLease totally of his own choice because he "never liked flying cargo," and did not have any training problems or performance problems of any kind there. (*Id.* at 30-32).

77. The training records from SkyLease, however, show that Rajabi had serious training and performance problems while employed at SkyLease. (Glenn Decl. ¶ 10 and ex. 6). According to the SkyLease training records, Rajabi had "limited control" and a "rough touchdown" while landing the simulator during training, and exhibited a "bad attitude" and was difficult to work with. (*Id.*).

78. Rajabi was taken out of flying status by SkyLease effective October 29, 2011. (Glenn Decl. ¶ 10 and ex. 6). Rajabi's check airman, Robert Lohlein, informed the Chief Pilot of SkyLease that he could not in good faith recommend continuing to train Rajabi and that he "cannot lose the very strong feeling that should he be signed off there will either be a wing tip strike[,] a tail strike or worse." (*Id.*).

79.     After being informed that he would be terminated and responsible for his training costs or he could resign and SkyLease would cancel his training contract, Rajabi submitted his resignation to SkyLease on November 11, 2011.  (Glenn Decl. ¶ 10 and ex. 6).

**K.     PSA's Pilot Workforce**

80.     PSA is a diverse airline which employs pilots of both American origin and other national origins.  PSA makes its employment decisions, including training, promotion, and termination decisions, without regard to national original or membership in any other protected group.  (Glenn Decl. ¶ 9).

81.     During 2007 and 2008, (the years of Rajabi's upgrade attempts), at least seven non-American First Officers tried and succeeded in upgrading to Captain.  During that same time, at least fourteen Americans and five non-American First Officers (including Mr. Rajabi) tried and failed to upgrade.  (Glenn Decl. ¶ 9).

### III.     LEGAL ANALYSIS

**A.     Summary Judgment Standard**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence is insufficient; rather, there must be evidence upon which reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In ruling on a motion for summary judgment, "[a] district court is not . . . obligated to wade through

-26-

and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

**B.    Rajabi's National Origin Discrimination Claim Fails.** [5]

    **1.    Rajabi Cannot Establish a *Prima Facie* Case of National Origin Discrimination.**

Rajabi claims that PSA discriminated against him when it did not promote him to Captain and when it terminated his employment after he twice failed to successfully complete the requirements to upgrade to Captain.[6]  Because Rajabi presents no direct evidence of discrimination,[7] the McDonnell/Douglas burden shifting analysis is used to assess whether it can establish a *prima facie* case.

To establish a *prima facie* case of discrimination based on circumstantial evidence, a plaintiff must show that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  Here, Rajabi cannot establish that he was qualified for the position or that PSA treated him differently than any other similarly-situated, non-Iranian employee.

    **a.    Rajabi Was Not Qualified To Be Promoted to Captain.**

Rajabi twice attempted to upgrade and twice failed: on his first attempt, two separate check airmen concluded that they could not recommend Rajabi for a checkride after observing

---

[5] The Ohio Civil Rights Act has the same standard of proof as Title VII claims.  *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)("[a]ll references throughout this opinion to Title VII are therefore equally applicable to the plaintiffs' claims under Ohio Revised Code § 4112").

[6] PSA notes that, although Rajabi claims that various PSA employees created hostile environments in the simulator, he has never alleged a claim for harassment based on his national origin, or for retaliatory harassment.

[7] Because none of the alleged statements concerning Iran, the hostage crisis, or Rajabi's accent are related to any employment decision made by PSA, they are not direct evidence of national origin discrimination.  *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010) (the few disparaging comments made by pilot's flight instructor and his first officer do not constitute direct evidence as they were not linked to the decision to terminate pilot's employment).

his performance in the simulator. (SUMF ¶¶ 25, 29). On his second upgrade attempt, Rajabi failed two separate checkrides conducted by two separate FAA-designated check airmen. (SUMF ¶ 55, 59). On the final checkride, he failed over 50% of the observed maneuvers. (SUMF ¶ 59). Even the ALPA pilot selected to observe the final checkride to ensure its fairness agreed with PSA's assessment. (SUMF ¶ 58). Indeed, the FAA agreed that PSA had adhered to its approved training program and complied with all Federal Aviation Regulations in Rajabi's training and checkride. (SUMF ¶ 71). Therefore, no trier of fact could reasonably conclude that Rajabi was qualified for the Captain position and any discrimination claim based on his failure to receive the Captain position must fail. *See Moore v. Abbott Labs*, 780 F.Supp.2d 600, 617 (S.D. Ohio 2011) (applicant who did not possess required sales experience in the applicable field cannot establish *prima facie* case of age discrimination).[8]

> **b.** **Rajabi Cannot Point to Any Similarly-Situated, Non-Iranian Pilot Who Received More Favorable Treatment.**

A plaintiff must prove by a preponderance of the evidence **all elements** of a *prima facie* case of discrimination. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). The Sixth Circuit has held that to meet this burden "the plaintiff [must] demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). This Rajabi cannot do because he cannot identify a similarly situated, non-Iranian pilot who: (1) was promoted after failing to pass training or a checkride; or (2) who remained employed after failing to pass the

---

[8]  Moreover, Rajabi's performance on the checkrides revealed significant qualification issues with him even holding the First Officer position. In fact, after Rajabi failed his first upgrade attempt, he took a First Officer requalification checkride in which a different check airman recorded that Rajabi had an unsatisfactory missed approach, but was trained to proficiency. (SUMF ¶ 40). The fact that Rajabi needed to be trained to proficiency on a position he already held evidences serious problems with his qualification for a higher position, and his failure to grasp or appreciate that there is a significant difference in the two positions further demonstrates his lack of qualification for the Captain position. (*See* SUMF ¶ 45 and Fusi Decl. ¶ 18 and exs. 1, 2).

check ride on two separate upgrade attempts.[9]  Moreover, PSA has severed the employment of each and every pilot who failed to pass two separate upgrade attempts in all of the time that Rajabi was employed at PSA.  (SUMF ¶¶ 65-67).  As such, Rajabi cannot establish the fourth prong of a *prima facie* analysis of his national origin discrimination claim.

 2. **PSA Has Stated Legitimate, Nondiscriminatory Reasons for Not Promoting Rajabi to Captain and for Terminating His Employment.**

 Federal law makes it clear that air carriers have the ultimate responsibility for air safety. *Air East, Inc. v. National Transp. Safety Bd.*, 512 F.2d 1227, 1229 (3d Cir. 1975), cert. denied, 423 U.S. 863 (1976); *Spurlock v. United Air Lines*, 475 F.2d 216, 219 (10th Cir. 1972). Moreover, an air carrier has a statutory duty to perform its services "***with the highest possible degree of safety in the public interest,***" 49 U.S.C. § 44702(b)(1)(A) (emphasis added).  When that duty has been breached, carriers may be liable for administrative and civil penalties, including suspension or revocation of an air carrier's operating certificate, not to mention jeopardizing flight safety.  *In re Paris Air Crash of March 3, 1974*, 399 F. Supp. 732, 747-48 (C.D. Cal. 1975).  (SUMF ¶ 18).

 In fulfilling this statutory duty, an airline is *required* to assess the competency of its pilots and must continually reassess its pilots to ensure that they will provide the highest possible degree of public safety, and even such factors as a pilot's "personal characteristics that could adversely affect safety" are to be considered.  14 C.F.R. § 121.413(c)(4)(ii).  (SUMF ¶ 18). Indeed:

---

[9] Rajabi has not asserted that he failed his upgrade attempts because of inadequate training; rather, he insists that he performed satisfactorily throughout his upgrade attempts and his failures are simply a broad conspiracy against him, in which ALPA and PSA are "all in the same bed" as well as several Flight Safety employees and the FAA.  (See generally SUMF ¶¶ 28, 30, 58, 61).  Nonetheless, Rajabi has not alleged the existence of any similarly situated, non-Iranian, comparator who received more training than he received without mitigating circumstances such as a substantial break between training sessions or a change of equipment and/or location.  Accordingly, even if Rajabi did assert that he failed his upgrade attempts because of inadequate or insufficient training, his claim would still fail.

> Safety in air transportation requires the air carrier . . . to identify
> those pilots who are marginal or who demonstrated a failure to
> adhere to proven procedures and reassign them to duties
> compatible with their capabilities and limitations.

*Aircraft Accident Report of the Civil Aeronautics Board*, adopted June 3, 1966, p.12, quoted in

*World Airways v. International Bhd. of Teamsters*, 578 F.2d 800, 803 (9th Cir. 1978).  This point

was succinctly made by the court in *World Airways*:  "[F]ederal law clearly places the

responsibility upon the airline to determine whether or not a pilot possesses the judgment to

serve as a pilot-in-command."  578 F.2d at 803-804.  See also Rajabi Dep. 96.

As federal law mandates, PSA owes a duty to the traveling public and its crews to operate

the airline in the safest manner possible.  As part of that duty PSA must constantly assess its

pilots to determine if they meet the qualifications to safely operate the aircraft they fly.

(SUMF ¶ 18).  If there is any doubt about a pilot's qualifications, judgment, or integrity, PSA has

no choice but to remove that pilot immediately from service – it is required by law.  (*Id.*).  PSA

cannot take the approach of "let's see how the pilot does and hopefully things will be fine."  All

it takes is one mistake when making split second decisions that can have devastating

consequences, costing lives.  (*See Id.*).

Rajabi twice chose to attempt to upgrade to the Captain position.  (SUMF ¶¶ 22, 45).

After failing his first upgrade attempt in 2007, Rajabi waited the minimum period of time before

applying to upgrade again.  (SUMF ¶ 45).  PSA did not promote Rajabi to Captain because

Rajabi twice failed to successfully complete the FAA required checkride during his second

upgrade attempt.  Moreover, PSA consistently severs the  employment of pilots who twice fail

upgrade attempts.  (SUMF ¶ 21).  Rajabi admitted he was aware that of this consequence when

he elected to try a second time.  (SUMF ¶ 47).  As such, PSA has met its burden to articulate

legitimate, nondiscriminatory reasons for its refusal to promote Rajabi to Captain and the resulting termination of his employment.

### 3. Rajabi Cannot Establish That PSA's Stated Reasons Were A Pretext for Intentional Discrimination.

In order to prevail on a discrimination claim where the defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must not only establish pretext, but also establish that the real reason for the employer's action was intentional discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). In order to establish pretext, Rajabi must demonstrate that PSA's proffered reason for taking adverse action either: (1) has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action. *Singleton v. Select Specialty Hosp. - Lexington, Inc.*, 2010 U.S. App. LEXIS 16175 (6th Cir. 2010). The plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson*, 319 F.3d at 866. A plaintiff's "conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell*, 964 F.2d at 585.

In an attempt to cast doubt on the stated reasons for his not being promoted to Captain and his resulting termination of employment, Rajabi points to a handful of comments that he believes showed national origin animus. Specifically, Rajabi claims that in a casual encounter at a hotel, Captain Gilliam asked him how he came to America, if he was in Iran during the hostage crisis, and commented that he had an accent. (SUMF ¶ 30). He also claims that in 2004 another employee (Dave Elderidge) held him up for initial training when he presented PSA with an expired passport, saying it was because he was Iranian. (SUMF ¶ 15). He admits however, that

an airline has a legitimate business reason to have a current passport for its pilots. (*Id.*). Finally, Rajabi claims that during a briefing he was asked to speak more slowly because of his accent, but even he admits that it is not improper to ask someone to slow down their speech. (SUMF ¶ 51). Such comments are insufficient to even suggest pretext. *Cecil v. Louisville Water Co.*, 301 Fed. Appx. 490 (6th Cir. 2008) (finding that a few inappropriate comments are too thin a basis on which to invalidate an employer's nondiscriminatory reasons). Moreover, stray remarks unrelated to adverse action and/or by employees unrelated to the adverse action are insufficient to satisfy a plaintiff's burden. *See Coleman v. Toys "R" Us*, 976 F. Supp. 713, 719 (N.D. Ohio 1997) ("Nor can statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. . . .").

Rajabi next attempts to support his claim that PSA's legitimate reason for terminating his employment was false because some of his former co-workers at PSA opined he was a good first officer. The subjective beliefs of former co-workers, however, mean nothing in a pretext analysis. Rather, it is the good-faith belief of the decision-maker that is relevant, and here PSA management harbored a good-faith belief that it could not trust Rajabi to safely operate its aircraft after he failed two successive upgrade attempts. Sixth Circuit courts have held that the opinions of co-workers who had no role in the decision-making process do not prove pretext. *See, e.g.*, *Haley v. GE*, 3 Fed. Appx. 240, 248 (6th Cir. 2001) ("Without more, mere opinions expressed by co-workers who have no direct involvement in the decision-making processes have no probative value as to GE's alleged discriminatory intent."); *Weller v. Titanium Metals Corp.*, 361 F. Supp. 2d 712, 722 (S.D. Ohio 2005) (finding that mere opinions of co-workers or past supervisors will not suffice to establish pretext); *Sullivan v. Delphi Auto. Sys. Corp.*, 198 F. Supp. 2d 952, 959 (S.D. Ohio 2002) (finding opinions of co-workers will not create a genuine

issue of material fact concerning pretext). Here, PSA management held a good-faith belief that Rajabi was not qualified to be Captain on its aircraft, and the co-workers on whom Rajabi relies for support had no role in Rajabi's training attempts and did not witness his repeated failures. Rather, virtually every instructor and check airman who evaluated Rajabi during his upgrade attempts, concluded that he could not be trusted to fly safely as a Captain. (SUMF ¶¶ 25, 29, 55, 59). Significantly, even his ALPA representative who sat in as a witness to his final attempt agreed. (SUMF ¶ 58). Accordingly, Rajabi's co-workers opinions hold no probative value concerning Rajabi's discrimination or retaliation claims.

Moreover, Rajabi's career outside of PSA demonstrates his proficiency problems are not manufactured by PSA to mask national origin animus. He failed a type ride with the FAA. (SUMF ¶ 11). He failed his Captain upgrade attempt at a prior airline. (SUMF ¶ 8). After leaving PSA, he had significant training issues at a subsequent airline, resigned to avoid termination, and then testified falsely about it in his deposition. (SUMF ¶¶ 76-79). In light of his work history, Rajabi simply cannot establish that PSA's demonstrated good-faith belief that he could not safely operate its aircraft was false.

Finally, PSA's statistics belie any discriminatory animus. PSA employs pilots of numerous national origins, both as First Officers and Captains. (SUMF ¶ 80). Several non-American First Officers successfully upgraded during the time Rajabi failed to do so. (SUMF ¶ 81). Several American First Officers similarly failed. (*Id.*) In implementing its consistent practice of severing the employment of pilots who fail two upgrade attempts, many pilots of American origin have been terminated or allowed to resign after failing two upgrades. (SUMF ¶ 65, 66, 81). Thus, PSA's judgment in Rajabi's case, which is consistent with its past employment decisions concerning other pilots (including Americans) who have failed two

upgrade attempts, should stand undisturbed. It is well-established that federal courts do not sit as super-personnel departments to second guess employers' business decisions, even if wrong - and this is especially true in areas of highly technical skills. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that it is "inappropriate for the judiciary to substitute its judgment for that of management"). *See also Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (stating that the role of judiciary is not to second guess employer); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (same).

Rajabi has absolutely no evidence from which a trier of fact could conclude that the stated reasons for PSA's actions are a pretext for national origin discrimination. Accordingly, because Rajabi cannot establish a *prima facie* case nor can he show pretext, summary judgment is appropriate on Rajabi's discrimination claims.

## C. Rajabi Cannot Establish Any Retaliation Based on Any Protected Activity.

Rajabi claims PSA retaliated against him by refusing to upgrade him and by terminating his employment in April, 2008. Specifically, Rajabi asserts that these actions were taken because he filed an EEOC charge in March, 2008. In order to establish a *prima facie* claim of retaliation under Title VII and the Ohio Civil Rights Act, Rajabi must demonstrate: (1) he engaged in protected activity; (2) the decision-maker had knowledge of the protected activity; and (3) a causal connection exists between the protected activity and the adverse action. Rajabi cannot establish prongs (2) and (3).

Rajabi did not receive the upgrade to Captain in 2008 because two different FAA-certified APDs evaluated his performance and each decided that Rajabi had failed. SUMF ¶¶ 55, 59. APLA agreed. SUMF ¶ 59. There is absolutely no evidence that these APDs, Captains Christner or Kumke, had any knowledge of any complaint of discrimination prior to the time each made the decision that Rajabi had failed. (SUMF ¶ 53, 59). Rajabi claims a non-PSA

employee, Greg Vallero, told him that he heard Rajabi was suing the Company. (SUMF ¶ 51). This one statement by a non-decision-maker (indeed, a non-employee of PSA) does not bolster Rajabi's retaliation claim. His lack of evidence of any knowledge by the two APDs who both failed him is fatal to Rajabi's retaliation claim. *See Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (finding retaliation claim failed because no evidence that decision-maker was aware of protected activity); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (same).

Similarly, Rajabi cannot demonstrate any causal connection between his protected activity and the adverse employment actions. Rajabi himself admits that he does not even know whether any of the APDs knew of his pending EEOC Charge during his checkrides (SUMF ¶ 53, 59), indicating that none of the check airmen referred to or commented on the EEOC Charge during training or during the checkrides. Rajabi has offered no proof that the decision to terminate his employment was motivated by anything other than these failed checkrides. The CBA specifically states that the Company has discretion over the continued employment of any twice-unsuccessful upgrade candidate. (SUMF ¶ 20). During Rajabi's entire tenure at PSA, no upgrade candidate who has failed twice has remained employed with the Company. (SUMF ¶¶ 65, 66). Even Rajabi admits that he is unaware of any pilots who failed two upgrade attempts and yet remained employed. (SUMF ¶ 67). Accordingly, Rajabi's employment was terminated in accordance with Company policy and the CBA, because he failed two upgrade attempts. There is no nexus between his upgrade failures, which resulted in his termination, and his EEOC Charge. This is particularly highlighted by his long history of training difficulties, far preceding any EEOC charge he filed and continuing to the present. (SUMF ¶¶ 8, 11, 14, 16, 17, 25, 28, 77-79).

Rajabi cannot establish two of the three prongs necessary for a *prima facie* claim. Moreover, even if Rajabi could establish a *prima facie* claim of retaliation, for all the reasons stated above in Section III.B.3, Rajabi cannot establish that PSA's stated reasons for its actions were a pretext to retaliate against him because of his EEOC charge. Therefore, PSA is entitled to summary judgment on this claim.

> **D.** **Rajabi Cannot Establish A Claim Of Wrongful Termination Based On Ohio Public Policy.**

A plaintiff seeking to establish a claim for wrongful termination in violation of public policy must show that: "(1) a clear public policy manifested in a statute, regulation or the common law; (2) that discharging an employee under circumstances like those involved would jeopardize the policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 460 (6th Cir. 2004). Rajabi's wrongful termination claim must fail because he cannot establish that a discharge under the circumstances of this case would jeopardize the public policy, that his discharge was motivated by conduct related to the public policy, or that PSA lacked an overriding business justification for his discharge.

First, discharge under the circumstances found here does not jeopardize any public policy. Rajabi twice attempted to upgrade to Captain and twice failed. In the course of his two upgrade failures, he was evaluated by many different check airmen and instructors, all of whom independently found that he was not capable of flying as a Captain for PSA. The CBA between PSA and ALPA provides that when a pilot fails two upgrade attempts, the Company has discretion over his continued employment. (SUMF ¶ 20). Rajabi is unable to point to a single example of a pilot who demonstrated an inability to upgrade on two separate occasions and yet was permitted to remain employed. Retaining Rajabi under these circumstances, when he had

failed to demonstrate his ability to safely operate PSA's aircraft after being given numerous chances to do so, would be a shockingly irresponsible act by PSA's management, which is entrusted with the lives of its passengers. (*See* SUMF ¶ 18). Discharging Rajabi under these circumstances does not jeopardize any public policy.

Moreover, Ohio courts have held that the second, or "jeopardy," element of the tort of wrongful discharge in violation of public policy fails where the policy at issue is found within a statute that provides both the substantive right and remedies for breach of that right. *See Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 244 (Ohio 2002) ("In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct."); *Gray v. Kroger Corp.*, 804 F. Supp. 2d 623, 631 (S.D. Ohio 2011) (finding that wrongful discharge in violation of public policy claim fails where plaintiff failed to prove underlying statutory claims and because "the public policy tort is unavailable where there are adequate statutory remedies."). The jeopardy element thus must fail because both the Ohio Civil Rights Act, OHIO REV. CODE ANN. §§ 4112.05, 4112.051 (2012), and Title VII, 42 U.S.C. § 2000e-5 (2012), provide an alternative enforcement mechanism and therefore the tort of wrongful discharge in violation of public policy is unavailable to Rajabi.

With regard to the third element, Rajabi cannot establish that the discharge was related to or motivated by either his national origin or by retaliatory animus. Rajabi's failure to successfully establish the essential elements of his discrimination and retaliation claims, as noted above, dooms his wrongful termination claim to failure. The Sixth Circuit has held that a plaintiff's "failure to present sufficient evidence to support the essential elements of [his] . . .

-37-

discrimination claim likewise precludes [his] ability to establish a public policy claim." *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 632 (6th Cir. 2008). *See also Desanzo v. Titanium Metals Corp.*, 351 F. Supp. 2d 769, 782 (S.D. Ohio 2005) ("A claim for wrongful discharge in violation of public policy embodied in statute prohibiting discriminatory practices will fail if the underlying discrimination claim fails."). Because Rajabi's claims for discrimination based on his national origin, and for retaliation, fail, his claim for wrongful termination in violation of public policy must likewise fail.

Finally, Rajabi cannot prove that PSA lacked an overriding business justification for its decision to discharge him after his two unsuccessful upgrade attempts. As discussed above, federal law places upon PSA the heavy responsibility of ensuring the safety of its passengers. *Air East, Inc.*, 512 F.2d at 1229; *Spurlock*, 475 F.2d at 219. If PSA fails in this responsibility, it can be subject to civil and administrative penalties. *In re Paris Air Crash of March 3, 1974*, 399 F. Supp. at 747-48. Rajabi himself admits that an airline simply cannot allow a pilot to operate its aircraft if it in good faith believes that pilot to be unsafe. (SUMF ¶ 18). Given PSA's responsibility for the lives of its passengers, and the serious consequences it would face if it failed in its duties to the traveling public, PSA certainly has legitimate, overriding business justifications for its decision to discharge pilots who have twice failed to successfully demonstrate they have the necessary judgment and skill to operate PSA's aircraft safely in the position they desire.

IV.    **<u>CONCLUSION</u>**

For the reasons stated above, this Court should enter summary judgment in favor of PSA as to all of Rajabi's claims.

This the 6th day of April, 2012.

s/ Patricia G. Griffith
_____
PATRICIA G. GRIFFITH (PG-7741)
Admitted *pro hac vice*
(Lead Trial Counsel)
FORD & HARRISON LLP
271 17th Street NW, Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3800
Facsimile: (404) 888-3863
pgriffith@fordharrison.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | |
|---|---|
| **BEHZAD RAJABI,** | |
| **Plaintiff,** | |
| **v.** | **CASE NO. 1:11-cv-00090-OWW-SKO** |
| **PSA AIRLINES, INC.,** | |
| **Defendant.** | Judge Walter H. Rice |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6[h] day of April, 2012, I electronically filed DEFENDANT

PSA AIRLINES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY

JUDGMENT with the Clerk of the Court by using the CM/ECF system, which will automatically

send e-mail notification of such filing to the following attorneys of record:

> MARY E. LENTZ
> MICAH M. SIEGAL
> Gottschlich & Portune, LLP
> 201 East Sixth Street
> Dayton, Ohio 45402
>
> MICHAEL T. CARR
> NATHAN JAMES WAGNER
> Law Offices of Michael T. Carr
> 2670 Myrtle Avenue, Suite 106
> Monrovia, California 91016
>
> *Attorneys for Plaintiff*

> s/ Patricia G. Griffith
> PATRICIA G. GRIFFITH
> Attorney for Defendant PSA Airlines, Inc

DC:108054.1