IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BEHZAD RAJABI,                          :

       Plaintiff,

    v.                                 :

PSA AIRLINES, INC.,

       Defendant.                      :

Case No. 3:11-cv-271

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING DEFENDANT PSA AIRLINES,
INC.'S, MOTION FOR SUMMARY JUDGMENT (DOC. #40);
JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST
PLAINTIFF; TERMINATION ENTRY

---

    Plaintiff, Behzad Rajabi ("Rajabi"), filed suit against his former employer, PSA

Airlines, Inc. ("PSA"), alleging national origin discrimination and retaliation in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1)

and 2000e-3(a). He also brought a state law claim for wrongful termination in

violation of public policy. This matter is currently before the Court on Defendant

PSA's motion for summary judgment (Doc. #40).

**I.    Background and Procedural History**

    Behzad Rajabi is a United States citizen of Iranian descent. He moved to the

United States in 1987, and began working as a commercial pilot in 1999. In

2000, while working as a First Officer for Corporate Airlines, Rajabi unsuccessfully

attempted to upgrade to the more senior rank of Captain.  Ex. 2 to Rajabi Dep.  He then worked as a self-employed flight instructor for several years.

In April of 2004, Rajabi was hired as a First Officer by PSA Airlines, Inc., a wholly owned subsidiary of US Airways Group.  As a pilot for PSA, Rajabi was represented by the Air Line Pilots Association ("ALPA") and subject to a collective bargaining agreement which governed training and promotions.  Rajabi's performance at PSA was generally satisfactory.  Fusi Dep. at 30.  Although two complaints were filed against him, no disciplinary action was taken.  *Id.* at 13, 19.

In September of 2007, Rajabi attempted to upgrade to Captain.  Rajabi Dep. at 134.  In order to be promoted to Captain, he had to successfully complete ground training and simulator training, and then be approved for a simulator "check ride."  Fusi Decl. ¶ 7.  Pursuant to the terms of the collective bargaining agreement, pilots had two chances to pass the checkride.  If a pilot failed the first checkride, additional training would be provided.  If the pilot failed the second checkride, the pilot would generally return to his or her previous position as a First Officer, and would have to wait six months before making another attempt to upgrade.  If, on the second attempt, the pilot still failed to qualify for promotion to Captain, PSA had discretion to terminate the pilot's employment, and it was PSA's customary practice to do so.  Ex. 3 to Fusi Decl.; Fusi Decl. ¶ 12.

On his first upgrade attempt, Rajabi successfully completed the ground training, but did not fare as well on the simulator portion of the training.  He was given four simulator training sessions with Captain Jason Kyle, a check airman for

2

PSA. Rajabi Dep. at 146-47. During these training sessions, Kyle asked him where he was from, how he got here, and how he became a citizen. Kyle also commented about Rajabi's strong accent and asked him if he ever thought of looking for a job where they could understand him. *Id.* at 166, 168. During the training, Kyle found deficiencies in Rajabi's situational awareness, crew resource management, and standard call procedures. Although Rajabi improved with each session, Kyle ultimately determined that Rajabi needed additional simulator training before he could be recommended for a checkride. Ex. 16 to Rajabi Dep.

That additional training was provided by Captain Jeff Gilliam, another check airman for PSA. Before that training session, Gilliam commented on Rajabi's accent and asked where he was from and how he got to the United States. When Rajabi told him he was from Iran, Gilliam asked if he was there during the hostage crisis. Rajabi Dep. at 178-82.

Rajabi maintains that Gilliam treated him in a hostile manner and set him up to fail. According to Rajabi, Gilliam failed to brief him before the training session. *Id.* at 172-74. During the session, Gilliam yelled, screamed, and swore at him, and rushed to get him out of the simulator. Arb. Hr'g Tr. at 392-400. Like Captain Kyle, Captain Gilliam found that Rajabi's skills were deficient in several areas. Ex. 16 to Rajabi Dep. Gilliam told Rajabi that he was not good enough to be a Captain *or* a First Officer and that he should go home. Gilliam did not recommend Rajabi for a checkride, rendering Rajabi's first attempt to upgrade to Captain unsuccessful. Rajabi Dep. at 175, 177. When Rajabi called Randall Fusi, PSA's

3

Manager of Flight Standards, to complain, Fusi allegedly hung up on him before Rajabi had a chance to explain that he thought he had been a victim of discrimination. *Id*. at 170.

Because Rajabi had demonstrated a lack of judgment and situational awareness during the simulator training sessions, he had to be requalified before being returned to his previous position. In October of 2007, following a short medical leave of absence, Rajabi passed the exam and was returned to his previous position as a First Officer. Fusi Decl. ¶ 18.

Several months later, on March 11, 2008, Rajabi filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming that, in failing to upgrade him to Captain in September of 2007, PSA had discriminated against him on the basis of his national origin. Ex. 24 to Rajabi Dep.

Shortly thereafter, in March of 2008, after waiting the requisite six months, Rajabi made his second upgrade attempt. He successfully completed the ground training and, this time, after completing six simulator training sessions with Flight Safety Instructor Greg Vallero, he was recommended for a checkride. Rajabi Dep. at 298-99. According to Rajabi, Vallero told him that he had heard from Fusi that Rajabi was trying to sue PSA. *Id.* at 292-93, 383.

In response to Rajabi's Charge of Discrimination, PSA submitted its position statement to the EEOC on April 3, 2008. Fusi authored part of that statement. Ex. 12 to Mem. in Opp'n to Mot. Summ. J.

Rajabi's first checkride took place on April 6, 2008, with Captain Matthew Christner. Captain Darren Harris, a supervisor, was also present. *Id.* at 300, 304. In order to pass, Rajabi had to satisfactorily complete each and every portion of the checkride. Christner found five areas of performance to be unsatisfactory, rendering the first checkride a failure. *Id.* at 327, 333.

Rajabi was then given 2.25 additional hours of simulator training by D.W. Bryant, another Flight Safety instructor, and underwent a second checkride on April 10, 2008, with PSA Captain Bruce Kumke. Captain Chase, who was Rajabi's union representative, and Fusi also attended this second checkride. Vallero acted as the First Officer. *Id.* at 354-62. Again, Rajabi failed the checkride. Kumke found that Rajabi's performance was unsatisfactory on thirteen of the twenty-one requirements. Fusi Decl. ¶ 23; Ex. 33 to Rajabi Dep. Captain Chase agreed with Kumke's assessment. Fusi Dep. at 113-14.

As noted earlier, PSA had a practice of terminating every pilot who failed to qualify as a Captain after two upgrade attempts. Fusi Decl. ¶ 12. In accordance with that practice, Rajabi was terminated, effective April 14, 2008. Ex. 36 to Rajabi Dep.

On June 1, 2008, Rajabi filed a second Charge of Discrimination with the EEOC, alleging national origin discrimination in connection with his second upgrade attempt, along with retaliation. Ex. 38 to Rajabi Dep. He also filed complaints with the Federal Aviation Administration ("FAA"), the Occupational Safety and Health Administration ("OSHA"), Exs. 40, 41, 43 to Rajabi Dep., and a grievance

with his union, Rajabi Dep. at 388.  After receiving his right-to-sue letter from the EEOC, Rajabi filed suit, alleging national origin discrimination and retaliation in violation of Title VII, and a state law claim of wrongful termination in violation of public policy.  Defendant PSA has now moved for summary judgment on all claims.

## II.    Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

6

475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal*

*Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Analysis

### A. Title VII Claims

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Another subsection of Title VII prohibits an employer from retaliating against an employee for opposing discriminatory employment practices. *See* 42 U.S.C. § 2000e-3(a).

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least

8

a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

Where, as here, the plaintiff has only circumstantial evidence of a discriminatory motive, claims are analyzed under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. The elements of a prima facie case vary somewhat depending on the theory of discrimination being asserted. If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 802-03. If the employer offers evidence of such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination [or not]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).

The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to motivate the discharge. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002). The plaintiff has the ultimate burden of persuading the trier of

fact that the employer intentionally discriminated against him or her. *Burdine*, 450 U.S. at 253.

"Where, as here, a case is at the summary judgment stage and a plaintiff seeks to prove discrimination via indirect, rather than direct, evidence, the plaintiff must submit evidence from which a reasonable jury could conclude both that [he] has established a prima facie case of discrimination and that the defendant's legitimate, nondiscriminatory reason for its action, if any, is pretext for unlawful discrimination." *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007).

### 1. National Origin Discrimination

In Count I of Rajabi's First Amended Complaint, he alleges that PSA discriminated against him on the basis of his Iranian national origin when he was wrongfully denied an upgrade from First Officer to Captain and then terminated.

In order to establish a prima facie case of discrimination based on national origin, Rajabi must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was treated less favorably than similarly-situated individuals outside the protected class. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

It is undisputed that Rajabi is a member of a protected class and that he suffered an adverse employment action. PSA argues, however, that Rajabi cannot establish a prima facie case of national origin discrimination because he cannot show that he was qualified to be promoted to Captain, and because he has not identified any similarly-situated, non-Iranian pilot who was treated more favorably.

### a. Qualified for the Position

Citing the two unsuccessful attempts to upgrade to Captain, PSA argues that Rajabi was not qualified for the position he sought.  The Sixth Circuit has made it clear, however, that at the prima facie stage, this inquiry rests on purely *objective* criteria such "the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003).  The Court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."  *Id.* at 574. That, however, is exactly what PSA asks the Court to do.

When Rajabi first attempted to upgrade to Captain, he had been a licensed pilot for fifteen years, and had been successfully employed by PSA as a First Officer for four years.  When he first became eligible and indicated his desire to attempt to upgrade to Captain, PSA placed him in an upgrade class.  In connection with each upgrade attempt, he successfully completed the ground training.  These facts support a finding that, from an objective standpoint, he possessed the education, experience, and general skills needed to be a Captain.  The fact that he ultimately failed the checkrides does not mean that he lacked the necessary objective qualifications for the job.

### b. Disparate Treatment

PSA next argues that Rajabi cannot establish a prima facie case because he has not identified any similarly-situated, non-Iranian pilot who was treated more

11

favorably.  PSA notes that no other employee was promoted to Captain after

failing to pass a checkride, and no other employee continued to be employed after

failing two separate upgrade attempts.

Rajabi alleges that PSA continued to employ two non-Iranian pilots, Kimani

Waltin and Sylvin Blackstock, as First Officers even after two unsuccessful

upgrade attempts.   Arb. Hr'g Tr. at 524-27.   This allegation, however, is simply

not supported by the record.  Like Rajabi, after failing their first upgrade attempt,

Waltin and Blackstock were requalified as First Officers.  All three later made a

second upgrade attempt.  Waltin successfully upgraded to Captain.  Blackstock,

however, failed in his second attempt and, like Rajabi, was terminated by PSA.

Fusi Supp. Decl. ¶¶ 6-9.  Based on the evidence presented, no reasonable jury

could find that Rajabi was treated less favorably than similarly situated non-Iranian

pilots in terms of continued employment.

Rajabi further argues that Waltin and Blackstock were treated more

favorably than he was in terms of the number of hours of simulator training they

were given in connection with their first upgrade attempt.  Arb. Hr'g Tr. at 524-

27.   PSA admits that Waltin and Blackstock received 13 more hours of simulator

training than Rajabi did, but argues that the additional training was justified by

unique circumstances.  Fusi Supp. Decl. ¶¶ 2-3.

Rajabi's additional training took place immediately, in the same location and

on the same simulator.  *Id.* at ¶ 5.  In contrast, Waltin and Blackstock began their

additional training in one location but, due to high training volumes, were then

subjected to a 21-day delay. They completed their training in a different city on a different simulator model. Because their training was interrupted for such a long period of time, and because they were using a different simulator model, retraining was required. *Id.* at ¶ 4. Therefore, although Waltin and Blackstock received more hours of simulator training, no reasonable jury could find that Rajabi was similarly situated to Waltin and Blackstock "in all of the relevant aspects." *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Finally, Rajabi argues that, in connection with the first upgrade attempt, he was subjected to a discriminatory evaluation during the training session with Captain Gilliam.[1] He testified that Gilliam gave him no pre-briefing, yelled and screamed at him, and rushed to get him out of the simulator. He further argues that even though the training session lasted just one hour and there was no briefing, Captain Gilliam wrote down that the training session lasted two hours and that there was one hour of briefing. Arb. Hr'g Tr. at 385-400. Rajabi, however, has failed to identify any similarly-situated non-Iranian pilots who were treated more favorably during a training session with Captain Gilliam or any other check airman.

---

[1] PSA notes that Rajabi does not contend that he was treated unfairly in connection with his second upgrade attempt, during which he failed both checkrides. According to PSA, this supports a finding that he was not discriminated against in connection with the *first* upgrade attempt either, but rather legitimately failed it. In the Court's view, while this may be relevant to the question of pretext, it is not relevant to the question of whether Rajabi has established a prima facie case of national origin discrimination.

Rajabi maintains that he can establish a prima facie case simply by presenting evidence of other circumstances that suggest a discriminatory motive. He points to the comments Kyle and Gilliam made about his national origin and his accent, and his testimony that Fusi hung up on him when he called to complain that he had been treated unfairly. In so arguing, Rajabi improperly attempts to conflate the tripartite burden-shifting analysis. While the evidence cited might be relevant to prove pretext, the Court need not reach that issue at this stage of the analysis.[2]

In order to establish a prima facie case of national origin discrimination, Rajabi must show that he was treated less favorably than similarly-situated non-Iranian employees. *DiCarlo*, 358 F.3d at 415. Because Rajabi has presented no evidence of disparate treatment, he has failed to establish a prima facie case of national origin discrimination. PSA is therefore entitled to summary judgment on this claim. *See Vincent*, 514 F.3d at 494 (holding that a plaintiff seeking to avoid summary judgment must submit evidence from which a reasonable jury could find both a prima facie case and pretext).

---

[2] Likewise, the Court need not reach the issue of whether PSA may be held liable under a "cat's paw" theory of liability, which is based on Rajabi's allegations that even though Gilliam and Fusi were not the ultimate decision-makers, Gilliam's failure to recommend him for a checkride in connection with the first upgrade attempt was a proximate cause of his ultimate termination for failing two upgrade attempts, and Fusi's derogatory comments to the decision-makers influenced their decision.

### 2. Retaliation

In Count II of Rajabi's First Amended Complaint, he alleges that PSA retaliated against him in connection with his second upgrade attempt in April of 2008 for filing a Charge of Discrimination with the EEOC the previous month.

In order to establish a prima facie case of retaliation, Rajabi must show that: (1) he engaged in protected activity under Title VII; (2) PSA knew of the protected activity; (3) PSA thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995 (6th Cir. 2009).

Here, it is undisputed that: (1) Rajabi engaged in protected activity in March of 2008 when he filed a Charge of Discrimination with the EEOC; (2) PSA knew that he had filed the Charge of Discrimination; and (3) PSA thereafter took an adverse employment action against him by terminating him following his second failed upgrade attempt. At issue is whether there is a genuine dispute of material fact concerning the requisite causal connection. Rajabi "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co.*, 348 F.3d 537, (6th Cir. 2003).

Rajabi argues that the temporal proximity between the filing of the EEOC Charge on March 11, 2008, and his termination just five weeks later on April 14,

15

2008, is sufficient to establish the causal connection.[3] The Sixth Circuit has held

that "[w]here an adverse employment action occurs very close in time after an

employer learns of a protected activity, such temporal proximity between the

events is significant enough to constitute evidence of a causal connection for the

purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool &

Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Notably, In *Mickey*, the plaintiff was

fired the very same day his employer learned that he had filed a charge of

discrimination. The Sixth Circuit, however, has repeatedly cautioned "about the

permissibility of drawing an inference of causation from temporal proximity alone."

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). Usually,

the temporal proximity must be "coupled with other indicia of retaliatory conduct."

*Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir.

2006)).

   In this case, assuming *arguendo* that the one-month gap supports a finding

of a causal connection, Rajabi faces another hurdle. A plaintiff cannot establish

the requisite causal connection without also showing that the relevant

decisionmaker knew of the protected activity. As the court recently noted in

*Hopkins v. Canton City Board of Education*, 477 F. App'x 349, 361 (6th Cir.

2012), a decisionmaker cannot retaliate "when unaware of the supposed triggering

---

[3] PSA notes that Rajabi waited to file his EEOC Charge of Discrimination until just
one month before he made his second upgrade attempt, knowing that his
employment would be terminated if he failed again. PSA argues that Rajabi should
not be permitted to benefit from the filing delay, and that more than temporal
proximity should be required to establish the requisite causal connection.

act."  *See also Williams v. Zurz*, No. 10-4161, 2012 WL 5351270, at *6 (6th Cir.

Oct. 30, 2012) (holding that a one-month gap between the protected activity and

the termination was insufficient to establish a causal connection where there was

no evidence that the decisionmaker knew of the protected activity); *Brungart v.*

*BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)

("temporal proximity alone is insufficient to create a genuine issue of fact as to

causal connection where there is unrebutted evidence that the decision maker did

not have knowledge that the employee engaged in protected conduct").

Here, Joe Rose, PSA's Director of Operations, and Tim Keuscher, PSA's

Vice President of Operations, made the ultimate decision to terminate Rajabi's

employment following the second upgrade attempt.  Fusi Dep. at 105.  Rajabi has

presented no evidence to support a finding that they were aware that he had filed

a Charge of Discrimination.  Moreover, their decision was in accordance with a

longstanding company practice whereby all pilots who failed their second upgrade

attempt were either terminated or permitted to resign in lieu of termination.  Fusi

Decl. ¶¶ 12, 24; Fusi Dep. at 104.  In this respect, Rajabi's fate was more or less

sealed when he failed the second upgrade attempt.

Under these circumstances, it could be said that Captains Christner and

Kumke, who administered the checkrides during the second upgrade attempt and

determined whether he passed or failed, held the key and played a significant role

in the decisionmaking process.  But, as PSA points out, Rajabi has not presented

any evidence that Christner or Kumke knew that Rajabi had filed a Charge of

17

Discrimination.  Rajabi admitted at his deposition that no one said anything about it during the checkrides, and he did not know whether Captain Christner or Captain Kumke knew of his pending EEOC Charge.  Rajabi Dep. at 323, 370, 383.

Rajabi attempts to establish the requisite causal connection through Fusi, and argues that Fusi significantly influenced the decisionmaking process.  It is undisputed that Fusi learned of the EEOC charge at some point before Rajabi was terminated.  Fusi Dep. at 70.  Fusi allegedly also told Greg Vallero, the Flight Safety Instructor who recommended Rajabi for a checkride in March of 2008, about the EEOC charge prior to that training session.  Rajabi Dep. at 292-93, 383.  Fusi and Vallero were both present during Rajabi's final checkride with Captain Kumke, but there is no evidentiary basis for imputing their knowledge of the EEOC filing to Christner or Kumke.  Likewise, there is no evidence that Fusi or Vallero in any way attempted to influence the outcome of the checkrides.  As the Sixth Circuit held in *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002), speculation of a conspiratorial theory is insufficient to establish a causal connection.

Fusi had no say in the ultimate decision to terminate Rajabi's employment.  Fusi Dep. at 76-77; Fusi Decl. ¶ 24.  He did, however, talk to Joe Rose and Tim Keuscher about Rajabi's training and training records.  Fusi Dep. at 70.  He admittedly told them that he believed that Rajabi was a below average pilot who was not likely to be successful in the future.  *Id.* at 78.

Rajabi invokes the "cat's paw" theory of liability, arguing that because Fusi intended his comments to result in Rajabi's termination, PSA should be held liable

18

for retaliation. In support, Rajabi cites to *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1194 (2011), a case involving alleged violations of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4311. The plaintiff, who served in the National Guard, alleged that his immediate supervisors were motivated by an antimilitary animus when they disciplined him, and that said discipline later influenced the hospital's decision to fire him. The Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate termination action, then the employer is liable." *Id.* (footnote omitted) (emphasis in original).

This "cat's paw" theory of liability is inapplicable here for two reasons. First, there is no evidence to support a finding that Fusi's comments to Rose and Keuscher were motivated by a retaliatory animus. Although Fusi was aware that Rajabi had filed an EEOC Charge, the record is devoid of any evidence that Fusi sought to retaliate against him for doing so. Second, there is no evidence to support a finding that Fusi's comments were a proximate cause of Rajabi's termination. As explained above, it was the practice of the company to terminate *all* pilots who failed two upgrade attempts. Rose and Keuscher terminated Rajabi's employment in accordance with that practice.

To summarize, even though Rajabi was terminated just five weeks after filing his Charge of Discrimination with the EEOC, temporal proximity is insufficient, under the circumstances presented here, to establish the requisite

19

causal connection. There is no evidence that the decisionmakers knew of the pending EEOC charge and no basis for imputing knowledge to them. There is also no basis for imposing a "cat's paw" theory of liability in this case. In short, the alleged causal connection is simply too speculative and too tenuous. The Court concludes that Rajabi has failed to establish a prima facie case of retaliation. PSA is therefore entitled to summary judgment in its favor on this claim.

Even if Rajabi had established a prima facie case of retaliation, he has failed to present sufficient evidence from which a reasonable jury could find that the proffered reason for his termination, *i.e.*, his unsuccessful performance during two separate upgrade attempts, is pretextual. As PSA notes, Captain Chase, the union representative who attended the final checkride at Rajabi's request, agreed with Captain Kumke's assessment of Rajabi's performance. Fusi Dep. at 113-14. In addition, Rajabi had previously encountered performance difficulties when he attempted to upgrade to Captain while he was employed by Corporate Airlines. Rajabi Dep. at 69. While at PSA, he encountered performance difficulties after completing his initial training, and failed a proficiency check during his probationary period. *Id.* at 123-24. After his termination from PSA, Rajabi went to work for SkyLease, but was taken out of flying status shortly thereafter, again because of performance problems. Exs. 6-7 to Glenn Decl. Under the circumstances presented here, Rajabi has offered insufficient evidence to support a claim that he was retaliated against because he filed a Charge of Discrimination.

**B. Wrongful Discharge in Violation of Public Policy**

In Count III of Rajabi's First Amended Complaint, he alleges that PSA's

discriminatory and retaliatory conduct violated clear public policy as manifested in

Title VII, the California Constitution, California's Fair Employment and Housing Act,

and Ohio Revised Code Chapter 4112.[4]  In order to succeed on a claim of wrongful

discharge in violation of public policy, a plaintiff must prove: "(1) a clear public

policy manifested in a statute, regulation or the common law; (2) that discharging

an employee under circumstances like those involved would jeopardize the policy;

(3) that the discharge at issue was motivated by conduct related to the policy; and

(4) that there was no overriding business justification for the discharge." *Knox v.

Neaton Auto Prods. Mfg.*, 375 F.3d 451, 460 (6th Cir. 2004).

In its motion for summary judgment, PSA argued that Rajabi cannot

establish the second, third, or fourth elements.  With respect to the second

element, PSA argued that where, as here, there are adequate statutory remedies

available, the public policy at issue is not "jeopardized" by the discharge. *Gray v.

Kroger Corp.*, 804 F. Supp. 2d 623, 631 (S.D. Ohio 2011).  Citing S*taunch v.

Continental Airlines, Inc.*, 511 F.3d 625, 632 (6th Cir. 2008), PSA further argued

that because Rajabi's statutory claims fail, his public policy claim does also.

Finally, PSA argued that the claim fails because airline passenger safety provides

an overriding business justification for the discharge.

---

[4] Rajabi is a resident of California.

Rajabi did not respond to any of these arguments in his memorandum in opposition to the motion for summary judgment, and did nothing to further advance this claim.  The Court concludes that Rajabi has failed to create a genuine issue of material fact with respect to his public policy claim, and that PSA is entitled to judgment as a matter of law thereon.


IV.    **Conclusion**

For the reasons set forth above, the Court SUSTAINS Defendant PSA Airlines, Inc.'s, motion for summary judgment (Doc. #40).


Judgment will be entered in favor of Defendant and against Plaintiff.


The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.



Date: January 28, 2013                          _____

                                                WALTER H. RICE
                                                UNITED STATES DISTRICT JUDGE



22